**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 13, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DWAYNE WILSON,

Defendant - Appellant.

No. 05-1275

(D. Colorado)

(D.C. No. 03-CR-36-RPM)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Dwayne Wilson was convicted, following a jury trial, of thirteen counts

relating to his participation in a drug distribution conspiracy and was sentenced to

240 months' imprisonment, followed by ten years of supervised release, and

assessed a special assessment of $1300. He appeals, challenging the district

court's denial of his motion to suppress wiretap evidence and its refusal to order

the government to produce polygraph data, and raising several sentencing issues.

For the reasons set forth below, we affirm.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## BACKGROUND

Wilson and eighteen alleged coconspirators were first indicted in January 2003. The charges resulted from an investigation initiated by the Denver, Colorado, Metropolitan Gang Task Force, working with agents of the Federal Bureau of Investigation ("FBI") (collectively referred to as the "Task Force"), in August 2001, after hearing from an informant that members of the Crenshaw Mafia Gangster ("CMG") Blood street gang, including Donovan Stallings, were involved in the distribution of large quantities of cocaine and crack cocaine. Stallings was the initial focus of the Task Force's investigation. Beginning in October 2001, the Task Force sought and obtained court authorization to utilize pen registers and trap and trace devices on Stallings' cellular telephone.[1] Through these mechanisms, the Task Force identified and interviewed a second informant in January 2002 who then cooperated with the Task Force in carrying out a number of controlled buys of cocaine from Stallings. The Task Force used these occasions to conduct further surveillance of Stallings' movements. The second informant also introduced an undercover officer to Stallings. In August 2002, the Task Force also obtained court authorization to place a GPS tracking

_____

[1]According to a Task Force investigator, "[a] pen register is an electromechanical device which registers and records the date and time of both incoming and outgoing calls and records the telephone numbers called from that particular telephone." Aff. in Support of [Wiretap] Application at 19, R. Vol. II ex. 1-B. A trap and trace device "identifies the origin of telephone calls made to a particular telephone number." Id.

device on Stallings' vehicle. When the vehicle was towed for the purpose of installing the GPS device, a dog trained in narcotics detection alerted on the vehicle, a search warrant was obtained, and a search was conducted.

By this time, the Task Force had identified Brian Quintana as another individual involved in the distribution conspiracy. In August 2002, the Task Force obtained court authorization to install a pen register and trap and trace device on Quintana's cellular telephone, and in October 2002, it obtained court authorization to install a GPS tracking device on Quintana's vehicle. On three occasions, the Task Force also conducted searches of Quintana's trash.

On October 24, 2002, the Task Force submitted an application for a court order authorizing a wiretap on Stallings' cellular telephone. The application stated that there was probable cause to believe that a group which it called the Denver, Colorado CMB Blood Drug Distribution Organization—including Stallings, Quintana, twelve other named individuals and others "as yet unknown"—were engaged in a cocaine distribution conspiracy and that the wire communications occurring through Stallings' telephone would reveal "the manner and means of distributing and delivering quantities of cocaine and cocaine base for profit." Application at 5, R. Vol. II ex. 1-A.

In a supporting affidavit, Special Agent Todd Wilcox described the information the Task Force had obtained using other investigative techniques and explained the limitations of those techniques. In regard to GPS tracking, the

affidavit stated that "the GPS data does not indicate who is driving the [vehicle] or if the driver actually meets with anyone," nor could it indicate "the exact address where the vehicle stops." Aff. in Support of [Wiretap] Application at 129-30, R. Vol. II ex. 1-B. In regard to pen registers and trap and trace devices, the affidavit explained that those methods "do not record the identity of the parties to the conversation, or differentiate between legitimate calls and calls for criminal purposes." Id. at 144. Moreover, the data that had been obtained indicated that the calls often involved cellular telephones which, in Special Agent Wilcox's experience, were often registered under false names.

In regard to visual surveillance, the affidavit stated that this method had failed to show "where and how often the delivery of the narcotics occurs or when and where the money 'pooling' takes place," nor had it "identified all of the suppliers of cocaine" to Stallings or other CMG Blood gang members. Id. at 131. Furthermore, the Task Force had not been able to determine through surveillance "where the drug proceeds are being kept, or where the drugs are currently being stored." Id. at 132. In regard to confidential sources, the affidavit indicated that although the Task Force had used an informant to conduct controlled buys from Stallings, those occasions had not revealed any information about Stallings' suppliers. The affidavit indicated Special Agent Wilcox's opinion that the undercover agent introduced to Stallings would also be unlikely to receive any information about suppliers. It also explained that possible witnesses or suspects

-4-

would likely be unwilling to reveal any useful information during interviews and that such interviews could compromise the ongoing investigation. Similarly, it was considered unlikely that searches of various locations where Stallings was known to spend time could be conducted without alerting Stallings and his coconspirators to the investigation, "thereby possibly causing them to flee, destroy evidence, or halt their business." Id. at 144.

As for the trash searches, they had confirmed that Quintana was involved in drug distribution but had not provided any further information. The affidavit also indicated that a variety of investigative techniques involving Postal Service checks of names associated with certain addresses and other checks of various types of records, including wages, tax returns, property taxes, and financial wire transfers, had "not provided concrete evidence involving the nature and scope" of the distribution conspiracy. Id. at 147.

The affidavit then listed the information that the Task Force hoped to learn through the requested wiretap, including the identification of members of the distribution organization that were not yet known, the roles played by all members, the identification of the organization's suppliers, and the identification of when and where meetings and deliveries took place. The application requested that the wiretap be allowed to continue for at least thirty days.

The district court issued an order authorizing a thirty-day wiretap on October 24, 2002. It agreed there was probable cause to believe Stallings and

others were engaged in a drug distribution conspiracy and that the interception of his telephone communications would reveal "the specifics" of the conspiracy and related offenses, "including the manner and means of the commission of the offenses." Order at 3, R. Vol. II ex. 1-C. The court further concluded that "it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." Id.

The Task Force applied for, and the district court granted, extensions of the wiretap authorization on November 22, 2002, and January 9, 2003. Pursuant to the court's orders, during the period that the wiretap was in place, the United States Attorney's office filed periodic reports with the court containing updates on the information obtained through the wiretap. A number of telephone calls between Stallings and Wilson were monitored through the wiretap during this period.

A grand jury indicted Stallings, Wilson, and nineteen others on January 31, 2003. The indictment contained sixty-eight counts, five of which applied to Wilson. Stallings, Wilson, and several other codefendants were arrested on February 7, 2003. Wilson filed a motion to suppress the wiretap evidence on April 14, 2003. A number of Wilson's codefendants also filed motions to suppress. Following a hearing, the district court issued an order on November 12, 2003, denying the suppression motions of eight codefendants, including Wilson.

In doing so, the court stated that the judge issuing the wiretap authorization and its extensions was justified in concluding that the wiretap was necessary based on the government's affidavit explaining the use and limitations of other investigative techniques.

After Stallings' arrest, he was interviewed by FBI investigators about his contacts with Wilson. During an interview on May 15, 2003, Stallings implicated a number of his and Wilson's codefendants in cocaine distribution activities, but he stated that Wilson had only been involved in selling marijuana. On August 5, 2003, Stallings again stated that Wilson had never purchased cocaine from him. The government refused to enter a plea agreement with Stallings after these interviews. At Stallings' request, he was given a polygraph examination, during which he again denied Wilson's involvement with cocaine distribution. The FBI agent conducting the exam told Stallings that the polygraph indicated he was being untruthful. When Stallings was interviewed again, on January 23, 2004, he told the FBI investigators that Wilson had in fact been involved in cocaine as well as marijuana distribution.

Stallings entered into a plea agreement on February 21, 2004, pled guilty two days later, and was sentenced to 141 months' imprisonment, later reduced to 129 months. Wilson's other codefendants in the original indictment also pled guilty. A superseding indictment was issued on February 25, 2004, charging

Wilson alone with eighteen counts related to marijuana and cocaine distribution and conspiracy to distribute cocaine, along with one forfeiture count.

On December 7, 2004, Wilson filed a motion requesting the court to order the United States "to produce full, true and correct copies of hard data results from all polygraph machine examinations of Donovan Stallings . . . carried out in connection with statements Stallings made in this case," together with "all notes, records, and memorand[a] made by the polygraph examiner" and the questions the examiner asked during the examination. R. Vol. I, doc. 946, at 2. Wilson's motion indicated that the purpose of the request was "so that an independent polygraph expert can [juxtapose] specific questions asked . . . against the specific resulting polygraph readings . . . [and thereby] form an opinion as to truthfulness or lack of truthfulness of [Stallings'] answers." Id. The motion further stated that if the expert's analysis of the polygraph results demonstrated that Stallings had not been untruthful when he stated Wilson was involved only in marijuana distribution, "and if the prosecution misle[]d Stallings on this issue, then appropriate Motions would be warranted." Id. at 3.

The district court heard arguments on this motion at a status conference on January 7, 2005. In response to the court's question regarding what use Wilson would make of the polygraph results, Wilson indicated that if the results showed that the polygraph examiner had lied to Stallings, "that is misconduct to the point that would entail further motions to be presented the Court." Tr. of Status

Conference at 15, R. Vol. VIII.  The court denied Wilson's motion, stating that established law allowed the government to "lie under these interrogation circumstances."  Id.  Wilson then entered an objection on the record to the court's ruling.

A jury trial was held from February 7 to 16, 2005.  Wilson was found not guilty on five counts and guilty on the remaining counts, which included one count of conspiracy to distribute more than fifty grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and two counts of manufacturing, distributing, or possessing with intent to distribute more than fifty grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1).  Each of these three counts subjected Wilson to a mandatory minimum sentence as set forth in 21 U.S.C. § 841(b)(1)(A)(iii).  On February 23, 2004, two days before the government issued the superseding indictment naming Wilson as the sole defendant, the government had filed an amended information indicating that Wilson had a prior conviction for a felony drug offense.  The mandatory minimum sentence under § 841(b)(1)(A)(iii) for an individual with such a prior conviction is twenty years' imprisonment.  The presentence report ("PSR") prepared by the United States Probation Office calculated an advisory sentencing range of 262 to 327 months

based on the United States Sentencing Commission, <u>Guidelines Manual</u>.[2]  The government recommended a sentence of 262 months.

Wilson objected to the application of the twenty-year statutory minimum because the fact of his prior conviction had not been found by a jury and because 21 U.S.C. § 851, the statute requiring the government to file an information indicating a prior conviction, does not allow a defendant to challenge the validity of the prior conviction if it occurred more than five years before the date of the information.  The court overruled those objections and applied the statutory mandatory minimum of twenty years to each of the three counts under § 841(a)(1), to run concurrently.[3]  Noting the disproportionate nature of Wilson's mandatory minimum sentence when compared to the sentence received by Stallings, and exercising its discretion to sentence below the advisory Guidelines range, the court declined to increase Wilson's sentence beyond the statutory minimum.  Wilson now appeals his conviction and sentence.

_____

[2]We note that the PSR was not included in the record on appeal.  We therefore rely on the information contained in the Judgment regarding the PSR's calculations.

[3]The court also imposed lesser sentences on the other counts of Wilson's conviction.  Because it ordered that all sentences were to run concurrently, those sentences did not affect Wilson's term of imprisonment.

**DISCUSSION**

**I.     Motion to Suppress Wiretap Evidence**

Wilson first challenges the district court's determination that the initial

authorization for a wiretap on Stallings' cellular telephone and the two extensions

met the necessity requirement of the federal wiretap statute,[4] and argues that the

district court therefore erred in denying his motion to suppress the evidence

obtained through the wiretaps.  "'We review for an abuse of discretion a district

court's determination that a wiretap was necessary,'" placing the burden of

proving the wiretap invalid on the defendant.  United States v. Cline, 349 F.3d

1276, 1280 (10th Cir. 2003) (quoting United States v. Ramirez-Encarnacion, 291

F.3d 1219, 1222 (10th Cir. 2002)).  If the defendant does succeed in meeting this

burden, "evidence seized pursuant to the wiretap must be suppressed."  Id.; see 18

U.S.C. § 2518(10).

The federal wiretap statute sets forth "special procedures for obtaining

wiretap authorization" for law enforcement or investigative purposes, "including

presenting a written application to a judge," as described in 18 U.S.C. § 2518(1).

United States v. Green, 175 F.3d 822, 828 (10th Cir. 1999).  "Before granting the

application, the judge must find that the affidavit establishes necessity by

---

[4]Federal wiretaps, or electronic eavesdropping, by law enforcement are
governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968,
as amended, 18 U.S.C. §§ 2510-2522.

showing that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" United States v. Small, 423 F.3d 1164, 1172 (10th Cir. 2005) (quoting 18 U.S.C. § 2518(3)(c)).  If any traditional investigative techniques were not tried, "the government must explain why with particularity."  Ramirez-Encarnacion, 291 F.3d at 1222.  We must consider "all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap," id. (internal quotation omitted), keeping in mind the purpose of the necessity requirement "to insure that wiretapping is not used in situations where traditional investigative techniques would suffice to expose the crime."  United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir. 1997) (internal quotation omitted), overruled on other grounds by Ramirez-Encarnacion, 291 F.3d at 1222 n.1; see United States v. Giordano, 416 U.S. 505, 515 (1974) (recognizing Congress's "clear intent" in imposing the necessity requirement was "to make doubly sure that the statutory authority [for employing wiretaps] be used with restraint and only where the circumstances warrant").

Here, Wilson argues that the wiretaps were not necessary because "the primary goals of the investigation had been accomplished or were well on the road to being accomplished by other traditional investigative techniques at the time the [initial] intercept order was entered."  Appellant's Op. Br. at 13. According to Wilson, at the time the first wiretap application was filed, "most if

not all members of the" alleged conspiracy had been identified, together with their roles, including one of Stallings' suppliers, Clinton Perry. Id. at 15.

The original affidavit in support of the wiretap application did identify Perry as a suspected associate of Stallings, based on surveillance observation of him engaging in what Special Agent Wilcox suspected was a drug transaction and a subsequent traffic stop during which money was found in Perry's possession that was later identified as having been used by an undercover officer to purchase drugs from Stallings. However, this description also illustrates the limitations of traditional investigative techniques, as surveillance was unable to observe what was actually occurring during the suspected drug transaction and could only speculate regarding the relationship between Perry and Stallings. The government argues that identifying by name individuals that are suspected of some connection with a drug distribution conspiracy "is not the same thing as determining their role" in the conspiracy, "much less does it substitute for developing cases suitable for prosecution." Appellee's Br. at 9.

Below, the district court considered extensive arguments along the same lines as those Wilson asserts here. The court concluded that, "[w]hile it is true that many of the traditional methods of investigation were successful, the information was incomplete when measured against the broad objectives of the investigation," and these methods "stopped short of revealing Stallings' suppliers." Order at 5, R. Vol. I, doc. 648.

It thus upheld the wiretap authorization, stating that the affidavit had set forth sufficient details in its application to provide a basis for believing there was a "criminal organization" of some kind, and that Stallings "was a common link whose telephone communications would provide information about the interdependence of co-conspirators." Id. at 4. The district court also held that the government's applications for two extensions of the wiretap authorization were also adequately supported, "incorporating information gleaned from the earlier wiretap or wiretaps" to show "how continued wiretapping is necessary." Id. at 5.

Having thoroughly reviewed the record, we agree with the district court that the government's affidavits in support of the initial wiretap and the two extensions persuasively demonstrated that the wiretaps were necessary to achieve the objectives of the Task Force investigation. See United States v. Newman, 733 F.2d 1395, 1399 (10th Cir. 1984) (upholding necessity determination where traditional techniques "had failed to reveal the source of the drugs[] [or] the extent of the drug conspiracy"); United States v. Johnson, 645 F.2d 865, 867 (10th Cir. 1981) (upholding necessity determination where the government was "properly concerned . . . with identifying all of the members of the conspiracy, as well as the precise nature and scope of the illegal activity"); see also United States v. McLee, 436 F.3d 751, 763 (7th Cir. 2006) ("The government's demonstrated need for a wiretap as a means of identifying all coconspirators and the roles they occupied in the structure of the conspiracy is sufficient for a

-14-

finding of 'necessity' under the statute."). We therefore conclude that the district court did not abuse its discretion in determining the necessity requirement was met.

## II.    Production of Polygraph Graphs

Wilson next argues that the district court erred in refusing to order the government to hand over the actual graph results from Stallings' polygraph examination. Wilson contends that the government was obligated to provide these results under Rule 16, which mandates that a defendant be allowed to inspect "the results or reports of any physical or mental examination and of any scientific test or experiment if . . . the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(F)(iii). Where the issue has been preserved, we review the court's refusal to order the government to produce such results or reports for an abuse of discretion. United States v. Price, 75 F.3d 1440, 1445 (10th Cir. 1996).

As the government points out, however, Wilson did not argue below that he was entitled to the polygraph data under Rule 16. Rather, as indicated above, his stated reason for requesting the polygraph data was to determine whether the FBI investigators who examined Stallings had engaged in "misconduct" by telling him he had failed the polygraph when he actually had not. Tr. of Status Conference at 15, R. Vol. VIII. Wilson suggested below that such misconduct would provide a

basis for "further motions" to the court, presumably in order to request sanctions of some kind. Id.[5] Wilson did not cite Rule 16 in his written motion requesting the graph results or while arguing the point at the status conference, nor did he argue that the graph results were material to his defense. Because Wilson did not raise a Rule 16 issue below in regard to the polygraph data, we review his claim here for plain error.[6] See United States v. Teague, 443 F.3d 1310, 1314 (10th Cir. 2006) (discussing plain error review under Fed. R. Crim. P. 52(b)); see also United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1992).

Under plain error review, "we will reverse the judgment below only if 'there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial

[5]Wilson's reply brief suggests that his intention was to file a "motion to dismiss for outrageous governmental conduct." Appellant's Reply Br. at 3-4.

[6]Wilson contends that he did make a Rule 16 argument below because "if Stallings was tricked into giving incriminating statements against Wilson, such a fact is material to the defense." Reply Br. at 3. However, he points to no place in the record, and we have found none, where he argued, as he does here, that the polygraph graphs would allow him to present "evidence of Government trickery" at trial as a means of impeaching Stallings' testimony. See id. at 4. While Wilson did refer to impeachment evidence at the status conference, he made this reference when discussing his need for more complete information regarding the questions that were asked during the polygraph examination, not when discussing his need for the graphs. The court directed that the prosecution provide further information regarding "what those questions were, and what happened during this time." Tr. of Status Conference at 20, R. Vol. VIII. Notably, although at the time of the status conference the government was uncertain whether Stallings would be called to testify, Wilson failed to seek reconsideration of the court's ruling regarding the polygraph data after the government decided to call Stallings as a witness.

proceedings.'" Teague, 443 F.3d at 1314 (quoting United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc)). That standard is not met here. Wilson's argument on appeal is that, assuming Wilson's expert interpreted the polygraph data as showing Stallings' statement during the examination, that Wilson had only been involved in marijuana distribution, was true, Wilson would have been able to present this expert's testimony to show Stallings' contrary testimony at trial was false. This impeachment tactic essentially rests on the claim that the polygraph data and Wilson's expert's interpretation of the data are accurate. Wilson's attempt to introduce such expert testimony at trial would therefore be subject to a hearing pursuant to Daubert v. Merrell Dow Parm., Inc., 509 U.S. 579 (1993), to determine "whether the proffered evidence is reliable" under Fed. R. Evid. 702. United States v. Call, 129 F.3d 1402, 1404-05 (10th Cir. 1997). Such evidence would also be subject to Fed. R. Evid. 403. See Call, 129 F.3d at 1405.

Here, it appears likely that impeachment testimony of the type Wilson suggests would have been excluded under Rule 403. At trial, where Stallings testified that Wilson had been involved in cocaine distribution, Wilson's counsel cross-examined both Stallings and Special Agent Wilcox regarding Stallings' prior inconsistent statements that Wilson had only been involved in marijuana distribution, raising the implication that Stallings may have been influenced to change his story by his desire to obtain a plea agreement. See Trial Tr. at 425, R.

-17-

Vol. X; id. at 873, R. Vol. XII.  Any further attempt to impeach Stallings'

testimony using an expert's interpretation of the polygraph data would have been

largely cumulative.  Moreover, this court observed in Call that "[t]he credibility

of witnesses is generally not an appropriate subject for expert testimony,"

including testimony regarding polygraph data, because such testimony "usurps a

critical function of the jury . . . , which is capable of making its own

determination regarding credibility."  129 F.3d at 1406.  We therefore conclude

the district court did not commit plain error in failing to order the government to

produce the polygraph data.

## III.    Sentencing issues

Wilson raises a number of arguments regarding the twenty-year mandatory

minimum sentence that was triggered under 21 U.S.C. § 841(b) based on his prior

felony drug conviction.[7]  He first argues that the existence of a prior drug felony

conviction was an element of the offense with which he was charged, and the

government's failure to plead that element in his indictment or prove it to a jury

beyond a reasonable doubt was in violation of his Sixth Amendment right to a

jury trial as interpreted by the Supreme Court in Apprendi v. United States, 530

---

[7]Section 841(b) provides, in relevant part, that an individual who violates § 841(a) "after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment."  21 U.S.C. § 841(b)(1)(A).

U.S. 466 (2000), and United States v. Booker, 543 U.S. 220 (2005).  Wilson's

argument on this point is precluded by our prior holding to the contrary in United

States v. Moore, 401 F.3d 1220, 1224 (10th Cir. 2005).  See United States v.

Brothers, 438 F.3d 1068, 1074 (10th Cir. 2006) (observing that we cannot

overturn a prior decision of a panel of this circuit "barring en banc

reconsideration, a superseding contrary Supreme Court decision, or authorization

of all currently active judges on the court" (internal quotation omitted)).

Wilson next argues that the district court's application of the statutory

twenty-year minimum under 21 U.S.C. § 841(b) was in error because the

government filed the information required by 21 U.S.C. § 851, citing Wilson's

prior felony drug conviction, before the date of Wilson's superseding indictment.

Because Wilson did not raise this issue below, we review for plain error.[8]

---

[8]In his opening brief, Wilson argued that the district court lacked
jurisdiction to apply the statutory minimum because the information required
under § 851 was untimely.  In his reply brief, however, Wilson acknowledged that
this argument was foreclosed by United States v. Flowers, 441 F.3d 900, 903
(10th Cir. 2006), which held that the requirements of § 851, including those
related to timing of the government's filing, were not jurisdictional in nature.  We
therefore need not address Wilson's jurisdictional argument further.  We note that
the government cites Flowers for the proposition that Wilson forfeited his right to
raise this issue at all because he did not raise it below.  As the government
acknowledges, however, Flowers came before the court on collateral review.  See
Sapia v. United States, 433 F.3d 212, 217 (2d Cir. 2005).  On direct appeal, the
proper standard of review is plain error.  Fed. R. Crim. P. 52(b); see United States
v. Brown, 316 F.3d 1151, 1155 & n.1 (10th Cir. 2003).

Section 851 requires that, in order for the government to apply "increased punishment by reason of one or more prior convictions," it must, "before trial, or before entry of a plea of guilty, . . . file[] an information with the court . . . stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). Wilson cites no authority for the proposition that the information required under § 851, having been filed after the original indictment, must be refiled if the government, as it did here, subsequently files a superseding indictment in the same case. Moreover, the plain language of § 851 does not support such a reading. We therefore conclude that the district court did not commit plain error in relying on the information filed before the superseding indictment as satisfying § 851(a).

Wilson also argues that the requirement set forth in 21 U.S.C. § 851(c), that a defendant "file a written response to the information" filed by the government in order to object to the alleged prior conviction, violates his Fifth Amendment right against self-incrimination. He acknowledges that he did not raise this issue below and that we therefore review it for plain error.

Essentially, Wilson argues that the information that the government must file under § 851 is subject to Fed. R. Crim. P. 7 and 11 and therefore, the silence of a defendant who fails to file a response challenging the information must be construed as a plea of "not guilty" rather than an admission that the alleged prior conviction is accurate. See Fed. R. Crim. P. 11(a)(4) ("If a defendant refuses to

enter a plea . . . , the court must enter a plea of not guilty."). Courts have considered the information filed for purposes of § 851 to be subject to Rule 7, which sets forth general requirements for the nature and contents of indictments and informations. See, e.g., United States v. Garcia, 954 F.2d 273, 276 (5th Cir. 1992) ("Rule 7(c)(3) . . . does not distinguish between . . . informations used to charge a defendant with a crime and informations used for sentencing enhancement purposes."). Rule 11, on the other hand, which governs the procedures for entering pleas to criminal charges, does not refer to informations at all and is clearly concerned with pre-conviction charges, not with notices of sentencing enhancements based on prior convictions.

Wilson cites no authority, and we have found none, to the contrary. Rather, he cites Boykin v. Alabama, 395 U.S. 238 (1969), which held that a court's acceptance of a guilty plea without determining the plea was knowingly and voluntarily entered was in violation of the Fifth Amendment. Id. at 243. Wilson again appears to rely on an unsupported assumption that an allegation of a prior conviction is analogous to an original criminal charge. However, the constitutional protections accorded an accused prior to conviction are clearly distinct from any that might apply where a conviction has become final. At the same time, as the government points out, Wilson is incorrect in his assertion that § 851 shifts the burden of proving the existence of a prior conviction from the government to the defendant. While § 851 provides a procedure for a defendant

-21-

to contest a prior conviction, the burden to prove the prior conviction by a preponderance of the evidence remains with the government. See United States v. Cooper, 375 F.3d 1041, 1052 (10th Cir.), cert. denied, 543 U.S. 1011 (2004). We reject Wilson's claim of plain error on this issue.

Wilson finally argues that the district court erred by failing to follow § 851(b) by making "specific inquiry . . . as to whether [Wilson] admitted or denied the existence of [the alleged prior] conviction." 21 U.S.C. § 851(b). As Wilson does not claim to have preserved this issue below, we again review for plain error. Our review of the transcript of Wilson's sentencing hearing indicates that the district court did not make a specific inquiry regarding the prior conviction alleged in the government's § 851 information. However, Wilson did make a statement objecting to the state convictions indicated in his PSR as having been obtained in violation of his constitutional rights. Tr. of Sentencing Hr'g at 1813, R. Vol. XVIII. Wilson's counsel also challenged the five-year statute of limitations in 21 U.S.C. § 851(e), which prevented Wilson from challenging the validity of the prior conviction alleged in the information. The court denied that challenge, and Wilson did not raise the issue on appeal. While Wilson argues the district court failed to make a finding regarding the existence of the prior conviction, the court did adopt the findings of the PSR, which included that conviction. We conclude that the court's failure to engage in a specific inquiry did not amount to plain error in this case. See United States v. Thomas, 348 F.3d

-22-

78, 87 (5th Cir. 2003) (holding "a district court's failure to give the § 851(b) colloquy does not affect the defendant's substantial rights where the defendant failed to . . . challenge the conviction[] [alleged in the filed information] and never revealed what challenges he was prepared to level" (internal quotation omitted).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge