**F I L E D**

**UNITED STATES COURT OF APPEALS**

**April 30, 2007**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | No. 05-1330 |
| v. | (D. Colorado) |
| ALBERT CELIO, | (D.C. No. 01-CR-165 EWN) |
| Defendant-Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

## I. INTRODUCTION

Defendant-Appellant Albert Celio, a Doctor of Osteopathy licensed in

Colorado, was convicted by a jury on four counts of dispensing and distributing a

controlled substance in violation of the Controlled Substances Act, 21 U.S.C.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument.

§ 841(a)(1) and (b)(1)(C). Celio's convictions arose from four prescriptions for Percocet, a Schedule II narcotic, written for an undercover police officer posing as a patient. On appeal, Celio challenges his convictions on four grounds: (1) the evidence presented to the jury provided an insufficient basis for his conviction; (2) the district court failed to instruct the jury that it had to find Celio "knowingly" acted outside the scope of medical practice or without a legitimate medical purpose; (3) the district court abused its discretion in denying Celio's motions for a mistrial based on alleged discovery violations; and (4) prosecutorial misconduct interfered with Celio's right to a fair trial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court rejects each of Celio's arguments and **affirms** his convictions.

## II. BACKGROUND

According to evidence introduced at trial, the Drug Enforcement Agency ("DEA") began investigating Steve Compton, a friend and patient of Celio, for violating federal controlled substance laws. Compton had been officially dismissed from Celio's practice at the All Family Health Care Clinic after Compton obtained one of Celio's prescription pads and began writing himself prescriptions for Lorcet, a Schedule III narcotic. Celio, however, continued to see Compton after hours and maintained contact with him. The DEA's investigation of Compton led to an investigation of Celio, using Compton as a "cooperating

source." The Federal Bureau of Investigation ("FBI") was also involved in the DEA's investigation.

On May 11, 2000, Compton, working with the DEA, called Celio and said that a friend, "Robert Logan," needed a prescription for pain medication, but could not come in to see Celio. Compton told Celio "Logan" would give him $1000 if Celio would call in a prescription. Celio refused and said he needed to examine "Logan" in person before writing any prescriptions.

On May 18, undercover Denver police officer Roger Hogan, posing as "Robert Logan," visited Celio's office. He told Celio he needed Percocet for knee pain associated with an old football injury. Hogan told Celio he had last received a prescription from a doctor in Texas two weeks prior and that he had been taking one pill per day. Although Celio advised Hogan of other treatments for knee pain and urged him to get an x-ray, Celio wrote Hogan a prescription for thirty Percocet pills, mentioning several times that Percocet is a Schedule II narcotic that can attract notice when prescribed in high quantities.

A week later, on May 25, Hogan accompanied Compton to a lunch meeting Compton had arranged with Celio at a local establishment called the Sports Café. As pre-arranged with Hogan, Compton excused himself midway through the meeting. During Compton's absence, Hogan told Celio he needed a doctor he could "depend on." Hogan said Percocet worked well for him when he "part[ied]" and asked for three more prescriptions, mentioning that he would

share some of the pills with his girlfriend, Kimmy, and others in Dallas during an upcoming trip. Celio warned Hogan that the prescriptions "ha[d] to be limited in . . . volume" and couldn't be "over blatant." He also told Hogan he did not want the Percocet he prescribed to be shared with Compton. Hogan mentioned to Celio that he felt uncomfortable in the All Family Health Care Clinic itself, and asked to meet Celio outside the clinic to get "a couple month's worth" of renewal prescriptions. Celio and Hogan arranged to meet in the clinic parking lot later that same afternoon. Celio suggested Hogan page him with a "7" at the end of Hogan's phone number when he arrived. During this conversation, Hogan repeatedly mentioned to Celio he had $2000 that Celio could use for stock investments, which had been a topic of conversation between Compton and Celio earlier in the meeting.

Celio and Hogan met in the clinic parking lot about forty-five minutes after leaving the Sports Café. Although Hogan had only complained to Celio about knee pain, Celio told Hogan he would record the prescriptions on his clinic chart as treatment for degenerative joints and migraines. Celio then said, "You get headaches, I imagine. That's legit for this." Celio told Hogan not to get "carried away" because he could not "do more than . . . fifty in twelve days." He instructed Hogan, "[a] hundred a month is a good scenario," and indicated he could not go "beyond . . . a hundred a month." When Hogan said he would use the pills for partying and planned to share some with his girlfriend, Celio said

nothing to discourage Hogan from sharing the pills, but did say that all the prescriptions had to be in Hogan's name.

Celio ultimately wrote Hogan four prescriptions for Percocet. One prescription was dated May 25, and the others were postdated for June 1, June 15, and June 30. The first, third, and fourth prescriptions were for fifty pills each, while the second prescription was for sixty pills to accommodate Hogan's desire to share the pills with his girlfriend. When Celio documented these prescriptions on Hogan's chart, however, the prescription dates, quantities, and strengths did not match those on the prescriptions themselves. Toward the end of the May 25 parking lot meeting, Hogan gave Celio $2000 for the prescriptions.

Hogan had no further contact with Celio for almost two months. During two meetings in mid-July 2000, Celio indicated he was worried that a federal investigation of Steve Compton could lead back to him and, according to Hogan, told Hogan he could not write any more Percocet prescriptions until things "quieted down." The DEA and FBI continued to investigate Celio and the All Family Health Care Clinic by obtaining information from pharmacies. On December 11, 2000, federal agents executed a search warrant at the clinic.

Celio was indicted on May 5, 2001, for, among other things, dispensing and distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Of the eight counts on which Celio was initially indicted, four counts were dismissed. Each of the remaining four counts corresponded with the four

Percocet prescriptions Celio wrote for Hogan in the clinic parking lot on May 25. At trial, the government called five witnesses: Paul Jaster, a DEA agent involved in the investigation of Celio; Roger Hogan, the undercover Denver police officer who posed as the patient "Robert Logan"; Donna Lapetina, the owner and business manager of the All Family Health Care Clinic; Karen Lutz, the clinic's receptionist and office manager; and Thomas Gierwatoski, a pharmacist familiar with Celio. Celio did not present any evidence or witnesses in his own defense, arguing instead that the evidence was insufficient to support the charges against him and theorizing that he was engaged in an honest but misguided "reverse sting" to see if Hogan was providing pills to Compton. The jury found Celio guilty on all four counts. He was sentenced to twenty-seven months' imprisonment, followed by three years' supervised release.

## III. DISCUSSION

### A. Sufficiency of the Evidence

On appeal, Celio revives the sufficiency of the evidence argument he made when he moved for a judgment of acquittal at the close of the government's evidence. He contends there was insufficient evidence to prove he acted outside the usual course of medical practice or without a legitimate medical purpose when he wrote four Percocet prescriptions for "Robert Logan" in the All Family Health Care Clinic parking lot on May 25.

Rather than explaining how the record evidence is insufficient to support the jury's verdict, however, Celio's argument on appeal focuses on the standard this court should use to evaluate the sufficiency of the evidence. Celio urges this court to adopt a rule that, as a matter of law, a defendant's conviction must be reversed where "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt or innocence." *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995). As the government indicates in its brief, this court has rejected such a rule. *See United States v. Hooks*, 780 F.2d 1526, 1530 (10th Cir. 1986) (rejecting language in earlier cases "suggest[ing] that a criminal conviction cannot be sustained if a reasonable hypothesis could be designed which is consistent with innocence").[1]

In reviewing the sufficiency of the evidence to support a conviction, this court reviews the record *de novo* to determine whether, viewing both the direct and circumstantial evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004). Our examination of the evidence is not piecemeal but, rather, requires "collective inferences to be drawn from the evidence as a whole." *Id.* (quotation omitted). This court does

[1]Although a recent Tenth Circuit case employed the language rejected in *Hooks*, *see United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir. 2006), the *Hooks* formulation—adopted repeatedly in our case law over the past two decades—is the correct standard. *Accord United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004).

not, however, "weigh conflicting evidence or consider the credibility of witnesses." *United States v. Patterson*, 472 F.3d 767, 778 (10th Cir. 2006).

A thorough review of the record reveals a sufficient evidentiary basis for the jury's verdict. The provision of the Controlled Substances Act under which Celio was convicted makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense . . . a controlled substance" except as authorized by the statute. 21 U.S.C. § 841(a)(1). Dispensing a controlled substance includes "the prescribing . . . of a controlled substance." *Id.* § 802(10). The prescribing of a controlled substance by a physician is "authorized" only when the physician "acts with a legitimate medical purpose *and* in the usual course of professional practice." *Nelson*, 383 F.3d at 1233 (citing 21 C.F.R. § 1306.04(a)); *see also United States v. Moore*, 423 U.S. 122, 140 (1975). "[T]he very facts and circumstances surrounding the issuance of a drug prescription can support a finding that the prescription was *not* issued for a legitimate medical purpose." *United States v. Jamieson*, 806 F.2d 949, 951 (10th Cir. 1986). A good-faith exception protects physicians who dispense prescriptions in good faith in the course of reasonable legitimate medical practice. *See, e.g.*, *United States v. Hurwitz*, 459 F.3d 477–78 (4th Cir. 2006) (collecting cases setting forth objective good-faith standard).

The government's evidence, particularly the audiotape of the May 25, 2000, parking lot meeting between Celio and Hogan, could have led a reasonable jury to

find that Celio was not prescribing Percocet for a legitimate medical purpose or in the ordinary course of professional practice. Both in the parking lot and earlier at the Sports Café, Hogan provided multiple clues that he intended to use the drugs for "partying" and that he intended to share the pills with his girlfriend. Celio never inquired as to Hogan's knee pain or examined Hogan's knee at any time after the May 18, 2000, office visit, including when writing the four Percocet prescriptions on May 25. Celio indicated the prescriptions could be "legit" for headaches, which he said he assumed Hogan must get, even though Hogan's sole complaint to Celio was about an old knee injury. Additionally, the prescriptions Celio wrote on May 25 were for four pills per day, whereas the prescription written on May 18 was for one pill per day. Finally, during his two encounters with Hogan on May 25, Celio made multiple references to his concern about triggering DEA scrutiny or, as Celio referred to it, "look-sees." He indicated he could not write "high volume" prescriptions that would raise "red flag[s]" and could not prescribe more than a hundred pills per month for this reason. In addition to the interactions between Celio and Hogan, the jury also saw exhibits demonstrating mismatches between the prescriptions Celio wrote for Hogan and Celio's notations in Hogan's chart, and heard testimony from Agent Jaster regarding government regulations prohibiting the postdating of narcotic prescriptions. Based on the evidence referenced above as well as other evidence

adduced at trial, a reasonable jury could easily have found that Celio's actions fell outside the bounds of objectively reasonable medical practice.

Rather than disputing the foregoing facts, Celio attempts to justify his actions by arguing to this court, as he did to the jury, that his actions were part of a "reverse sting" to see whether Hogan was providing drugs to Compton. Celio explained to the jury that the "reverse sting" idea grew from his frustration at the DEA's apparent lack of progress in investigating Compton's theft and use of Celio's prescription pad to write unauthorized narcotic prescriptions. By finding Celio guilty, however, the jury implicitly rejected the applicability of the good-faith defense, as well as Celio's "reverse sting" theory. For the foregoing reasons, therefore, this court determines the evidence was sufficient to support the jury's verdict and concludes the district court did not err in denying Celio's motion for a judgment of acquittal.

## B.    Jury Instructions

With regard to the elements to be proven by the government, the court instructed the jury:

> First, [the government] must prove that the defendant, Albert Celio, knowingly or intentionally distributed or dispensed the controlled substance named in the particular count.

> Second, [the government] must prove that the defendant, Albert Celio, in distributing or dispensing the controlled substance, was acting either outside the usual course of medical practice or without a legitimate medical purpose.

The court also instructed the jury that Celio could not be convicted if he acted in good faith in the course of professional practice.[2] At trial, Celio did not propose any jury instructions or object to the challenged instruction. On appeal, however, Celio contends the trial court erred by failing to instruct the jury that, to convict Celio, it had to find he "knowingly" acted outside the usual course of medical practice or without a legitimate purpose. He claims the instruction on the elements lessened the government's burden of proof and conflicted with the good-faith instruction. He also suggests the good-faith instruction did not cure this defect because the instruction failed to inform the jury that it could only convict Celio if it found he acted in "bad faith."

Ordinarily, "we review jury instructions as a whole to determine whether they adequately state the applicable law, and review *de novo* whether a particular instruction is proper." *United States v. McConnel*, 464 F.3d 1152, 1158 (10th Cir. 2006). When a party fails to raise an objection in the court below, as Celio failed to do in this case, however, this court reviews the instructions for plain error. *United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006). Under the plain error standard, Celio's conviction can be reversed only if the jury instructions

[2]As part of the good-faith instruction to Celio's jury, the court instructed, "A physician may not be convicted when he dispenses controlled substances in good faith to patients in the regular course of professional practice." Good faith was defined for the jury as "the honest exercise of good professional judgment as to a patient's medical needs. Good faith connotes an observance of conduct in accordance with what the physician should reasonably believe to be proper medical practice."

contained an "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quotation omitted).

Celio's claim must fail because the instructions given were not plainly erroneous. *See United States v. Olano*, 507 U.S. 725, 733–34 (1993) (defining plain error as the violation of a legal rule that was clear or obvious at the time of trial). Celio does not cite any legal authority in support of his proffered inclusion of "knowingly," nor can this court find any authority to support Celio's position. There is nothing in the statutory language at 21 U.S.C. § 841(a)(1), the regulatory language at 21 C.F.R. § 1306.04, or any case law that requires the physician to "knowingly" act without a legitimate medical purpose or outside the usual course of professional practice. The statutory requirement of a "knowing" mental state applies only to the dispensation or distribution of the controlled substance. *See* 21 U.S.C. § 841(a)(1). Reflecting the statutory scheme that distribution and dispensation be "knowing," the accompanying regulation only uses the word "knowingly" to describe the requisite mental state of a pharmacist who fills an invalid prescription. *See* 21 C.F.R. § 1306.04(a).

Additionally, there is no opinion of this court or any other appellate court that indicates a physician must "knowingly" act outside the usual course of professional practice or without a legitimate medical purpose when writing a prescription in order to violate § 841(a)(1). To the contrary, other cases'

-12-

discussions of the elements of the crime track the statutory and regulatory language included in Celio's jury instructions. *See, e.g.*, *Nelson*, 383 F.3d at 1231–32 ("A practitioner has unlawfully distributed a controlled substance if she prescribes the substance either outside the usual course of medical practice or without a legitimate medical purpose"); *United States v. Varma*, 691 F.2d 460, 462 (10th Cir. 1982) (reciting the professional practice element without reference to a required mental state); *see also United States v. McIver*, 470 F.3d 550, 556 & n.9 (4th Cir. 2006) (failing to include "knowingly" in its recitation of the "outside the usual course of professional practice" instruction).

Finally, the good-faith instruction clearly informed the jury that it could not convict Celio if it found he "merely made an honest effort to treat his patients in compliance with an acceptable standard of medical practice." Any uncertainty the jury may have had as to whether it could convict Celio for an honest error in judgment would have been clarified by this instruction. For the foregoing reasons, this court concludes there was no error in the jury instructions.

## C. Mistrial Motions Based on Alleged Discovery Violations

Citing Federal Rule of Criminal Procedure 16, Celio claims the district court erroneously denied two of his motions for a mistrial premised on the prosecution's alleged failure to provide him with incriminating evidence prior to trial. The first challenged ruling occurred during the testimony of Agent Jaster and concerned statements Celio made during the December 11 search of the All

Family Health Care Clinic. Jaster testified that during the search he played Celio a tape of the May 25 parking lot meeting with Hogan and, after hearing the tape, Celio denied the voice on the tape was his. Despite his purported surprise at Jaster's testimony, however, Celio waited until after he had cross-examined Jaster to object to Jaster's testimony. Celio then argued the prosecution had not previously disclosed the existence of this inculpatory statement. He contended his voir dire questions, opening argument, and trial strategy would have been different had the statement been disclosed prior to trial. Although the district court acknowledged the non-disclosure of the statement may have constituted a discovery violation, it concluded the error was not intentional or malicious. The district court determined Celio was not prejudiced by the late disclosure of the statement and denied Celio's motion for a mistrial.

The second mistrial motion challenged on appeal occurred in response to Hogan's testimony. Hogan testified that, in July 2000, Celio said he could not write Hogan additional prescriptions at that time but might be able to deal with Hogan again in the future. Because of the poor quality of the surveillance tape, this conversation was apparently difficult to hear. Celio objected that the inculpatory material on the tape had not been disclosed prior to trial. The prosecutor argued the tape was audible if listened to repeatedly and that a transcript had long been available. The court denied Celio's motion, explaining the jury would have to decide how to interpret the tape.

This court reviews a district court's denial of a motion for a mistrial for an abuse of discretion. *United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005). When faced with a motion for a mistrial, a district court must determine whether an error occurred and, if so, "whether that error affected the defendant's right to a fair and impartial trial." *Id.* (quotation omitted). A district court's ruling will only be disturbed on appeal if its determination "was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Id.* (quotation omitted). A mistrial is a sanction of last resort and, particularly in the context of discovery violations, less drastic remedies are preferable. *United States v. Martinez*, 455 F.3d 1127, 1130 n.2 (10th Cir. 2006). A defendant should object to an alleged violation "at the first reasonable opportunity" in order to allow the court to take curative actions less drastic than a mistrial. *Id.*

The district court did not abuse its discretion when denying either of Celio's motions. As to the first motion, which Celio did not make at "the first reasonable opportunity," a fact that alone could weigh against granting a motion for a mistrial, *see id.* at 1131, the district court correctly determined that, even if an inadvertent discovery violation occurred, Celio was not prejudiced. Celio cross-examined Jaster about why he had not included the statement in his summary report, taped the conversation, or generated a more extensive written report about the execution of the All Family Health Care Clinic search warrant

and his interaction with Celio. As to Celio's argument that his trial strategy, including whether to testify in his own defense, would have been different had he known about Jaster's disclosure, the record is clear that Celio had not yet finalized a trial strategy at the time the disclosure was made. He did not decide until the end of the government's evidence whether to testify in his own defense or call Compton as a witness. Celio further argues he might have called other witnesses to challenge Jaster's testimony and the corroborating testimony of Karen Lutz. Celio, however, never moved for a continuance or otherwise indicated the need to interview witnesses or conduct further investigation.[3] Celio's other arguments, both those made to the district court regarding voir dire and those made for the first time on appeal, including the suggestion that Celio might have accepted a plea deal, are equally unpersuasive.

Regarding Celio's second motion, the district court's ruling was correct. Celio does not dispute the existence of the audiotape in question. His argument before the trial court was simply that the tape quality impeded his ability to hear the statement testified to by Hogan. The district court appropriately indicated that parsing the tapes fell to the jury and instructed the jury to disregard transcripts of the tapes where the tape and the transcript appeared to conflict or

---

[3]The trial court asked Celio whether he wanted the opportunity to interview Karen Lutz prior to her testimony in order to ameliorate any potential discovery violations. The defendant's investigator attempted such an interview prior to Lutz's testimony.

where words that appeared in the transcript were not audible on the tape. Based on the record before us, we conclude the district court properly denied Celio's motions for a mistrial.

**D.      Prosecutorial Misconduct Related to Character Evidence**

Celio contends on appeal that prosecutorial misconduct relating to evidence of Celio's prior bad acts occurred at several points during the trial, and that the cumulative effect of this misconduct prejudiced his ability to receive a fair trial. When the defendant objects to the alleged misconduct at trial and moves for a mistrial, this court reviews the district court's denial of the defendant's motion for an abuse of discretion. *United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001). When the defendant has merely objected to the statement without moving for a mistrial, however, there is no exercise of the district court's discretion for an appellate court to review. *Id.* In such cases, we evaluate the prosecutor's actions for harmlessness, and reversal is appropriate only when "the misconduct [has] . . . been flagrant enough to influence the jury to convict on grounds other than the evidence presented." *Id.* (quotation omitted). In evaluating "whether the misconduct had such an impact, we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." *Id.* (quotation omitted); *see also United States v. Maynard*, 236 F.3d 601, 604–07 (10th Cir. 2000). Cumulative error, which Celio asserts is present in this case, may lead to

-17-

reversal only when the flagrant misconduct standard outlined above has been met. *See United States v. Haar*, 931 F.2d 1368, 1377 (10th Cir. 1991) ("The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error." (quotation omitted)).

Each of the eight instances of alleged prosecutorial misconduct raised in Celio's opening brief are summarized below.[4] In this case, Celio objected to the prosecutor's actions in each of the instances properly raised on appeal, but moved for a mistrial in only one instance. Although this court shares the district court's frustration with respect to some of the prosecutor's actions, the district court gave appropriate curative instructions both during the trial and before the jury began its deliberations.[5] The nature of the evidence against Celio, along with the district

---

[4]In addition to the eight instances of alleged prosecutorial misconduct raised in his opening brief, Celio raises five additional allegations in his reply brief. Because Celio's belated allegations violate Federal Rule of Appellate Procedure 28(a)(9)(A) and the government did not have the opportunity to respond to the additional allegations, we deem Celio's arguments as to these additional five instances of purported misconduct as waived and do not consider them.

[5] As part of the pre-deliberation jury instructions, the court told the jury:

> The defendant is only on trial for the particular charges alleged against him in the Indictment. You have heard evidence that the defendant may have committed other acts which are not charged in the Indictment. I instruct you, however, that your job is to determine beyond a reasonable doubt whether the Government has proven the four charges alleged in the Indictment. If it has not proven a precise charge in the Indictment, then you must acquit the defendant on that charge, even though you think the defendant may have done some

(continued...)

-18-

court's curative actions, lead this court to conclude that the jury convicted Celio based solely on the evidence properly before it and that any individual or cumulative error was harmless.

*1. Jaster Testimony*

Celio's first three objections, which were not accompanied by a mistrial motion, relate to testimony elicited from Agent Jaster. The first was a hearsay objection to Jaster's testimony that the DEA began investigating Celio, in addition to another employee at the All Family Health Care Clinic, after receiving "other complaints" against Celio "regarding another former patient." The district court appropriately responded to the prosecutor's error by sustaining Celio's objection. Particularly in light of Celio's own assertions during his opening argument that he had called the DEA about the very same former patient, Steve Compton, there is nothing in the record to suggest this testimony was anything other than harmless.

The second challenged piece of testimony involves Jaster's explanation that the FBI became involved in the DEA's investigation because it had "information

---

[5](...continued)
other act not charged in the Indictment.

　　You are not here to return a verdict concerning the guilt or innocence of any person who is not specifically charged in the Indictment. You are here to determine whether the Government has proven its charges against this defendant beyond a reasonable doubt.

　　The possible guilt of others is simply irrelevant to a criminal charge in a case such as this. Do not let the possible guilt of others influence your decision about this defendant in any way.

on a previous investigation involving Dr. Celio and some other people." Celio objected to the testimony and the court sustained the objection. To ameliorate any harm from the statement, the court asked Celio whether he wanted the statement stricken, and then instructed the jury, "[I]t's improper to get into prior investigations. And the jury should ignore the testimony concerning any prior investigations the FBI had of Dr. Celio. It's totally irrelevant, totally improper. It is stricken." The limited nature of the misconduct, combined with the district court's clear curative instruction, rendered this testimony harmless.

The third instance of testimony Celio challenges is Jaster's testimony regarding a conversation he had with Celio in March 2000 when the DEA was investigating Steve Compton. Jaster testified he called the clinic "to talk to one of [Celio's] employees regarding another patient." According to Jaster, a short time later, he received a return call from Celio, who began talking about Steve Compton. Jaster testified Celio told him "he had provided Steve Compton's wife with prescriptions for controlled substances through Steve Compton" and that the DEA and FBI "made the conclusion that he was providing the prescriptions to Steve Compton for his wife, Stacy Compton." Celio objected to this last statement, arguing to the court "[A]t some point this is character assassination. And we're not trying the case on the indictment. At some point, this has got to stop." The court sustained the objection, indicating it agreed with Celio's characterization and adding "Let's go and see what happens. This is getting too

-20-

persistent." Because the court had already instructed the jury moments earlier to disregard any information related to the FBI's prior investigations of Celio, another curative instruction was not necessary. Furthermore, Jaster's statement about law enforcement's "conclusion" merely restated Celio's own statement to Jaster, which may have been admissible as the admission of a party-opponent under Federal Rule of Evidence 801(d)(2)(A). We conclude, therefore, while Jaster's testimony may have been improper as a violation of Rule 404(b), it was not flagrant enough to have improperly affected the jury's verdict under the harmless error standard.

The fourth challenge involves a reference Jaster made to a separate search warrant executed at All Family Health Care Clinic on the same day as the Celio search warrant. The subject of the second search warrant was Timothy M., whom the DEA and FBI were investigating for illegal acquisition and possession of steroids. Jaster also responded affirmatively to the prosecutor's inquiry into whether Timothy M. was "part of this case at one point." Celio moved for a mistrial in response to Jaster's reference to the Timothy M. investigation and Timothy M.'s involvement in Celio's case. Celio argued the reference impugned his character by suggesting he was engaged in or affiliated with other potentially illegal activity. The court denied Celio's motion for a mistrial, but sustained the objection. The court then informed the jury,

Members of the jury, you have just heard the witness testify about someone named [Timothy M.], and you've also heard some testimony about Mr. [M.]'s activities.

I want to tell you, this is a long and complex case. It was filed in 2001, so it's been pending a long time. And large parts of this investigation have nothing to do with other parts of the investigation. In particular, you are instructed that you are not to infer that the investigation of Mr. [M.] that you just heard about had anything to do with the pending charges against this defendant, Albert Celio.

Because Celio moved for a mistrial, we review the district court's denial of Celio's motion for an abuse of discretion. *Meienberg*, 263 F.3d at 1180. The district court's curative instruction appropriately responded to the improper testimony. The denial of the motion for a mistrial was not an abuse of the district court's discretion. Celio's challenge to the testimony regarding Timothy M., therefore, must fail.

*2. Lapetina Testimony*

Celio's next challenge involves the testimony of Donna Lapetina, the All Family Health Care Clinic's owner and the office administrator. The prosecutor asked Lapetina whether she had confronted Celio about his prescribing practices for narcotics between late 1999 and early 2000. When Lapetina indicated she had, the prosecutor asked how many times she had confronted Celio during that period. Celio made a relevance objection to the question, and, after a conference at the bench in which Celio argued the prosecution was trying to get in Rule 404(b) evidence of other bad acts, the court sustained the objection. Although the

prosecutor's question may have been prejudicial in a very general way, we have no grounds for concluding that the jury's verdict would have been influenced by the mere suggestion that Lapetina may have confronted Celio on more than one occasion about his narcotic prescriptions.

*3. Gierwatoski Testimony*

Celio's sixth challenge arises from the testimony of Thomas Gierwatoski, a pharmacist familiar with Celio. The government inquired as to whether, as part of his duties, Gierwatoski kept a file on the narcotic prescriptions Celio wrote between 1997 and 2000. When Gierwatoski indicated he had kept such a file, the government asked why. Celio objected. After the prosecutor explained the line of questioning was intended to show it was unusual for the pharmacy to have kept such a file, the court sustained Celio's objection. Celio asked for the prosecutor's explanation to be stricken from the record, and the court responded by instructing the jury that "the way a lawyer words a question is not evidence in the case." The government rested its case without attempting to elicit more information from Gierwatoski, and Gierwatoski never answered the question as to why he kept a file on Celio. Because the jury never heard a prejudicial response, the exchange was harmless and could not have influenced the basis for the jury's verdict.

*4. Prosecutor's Statements*

Celio's last two challenges relate to statements made by the prosecutor during the government's closing and rebuttal arguments. First, during the government's closing statement, the prosecutor played an audio clip of the May 25 Sports Café conversation in which Celio warned Hogan that he needed to keep his Percocet consumption to a reasonable level, advising Hogan that Doug S., another person referred to Celio by Compton, is "very reasonable with the meds." Celio went on to tell Hogan, "If it gets out of control, and it has in the past with some people . . . I let [th]em know." After playing this clip, the prosecutor commented, "This isn't the first time that Dr. Celio has done this kind of thing." Celio objected to the prosecutor's comment as "character assassination," arguing he was "trying to suggest that [Celio] had done other things that we haven't had evidence about . . . . It's the classic 404(b) suggestion." The court sustained the objection, reminding the government that the court had precluded the introduction of any evidence regarding Celio's relationship with Doug S. The court told the prosecutor to "move on." In light of the contents of the tape, which had been admitted into evidence and include Celio discussing his experiences with Doug S. and others, the prosecutor's statement, while inappropriate, was harmless. Based on Celio's audio-recorded statements, the jury could reasonably have inferred on its own that Celio prescribed pills for others outside the course of legitimate

-24-

medical practice. The prosecutor's statement, therefore, could not have improperly influenced the jury's verdict and was harmless.

Second, during the government's rebuttal argument, the prosecutor asked the jury to consider why Compton had not testified. Agreeing with Celio that Compton was a "scoundrel," the prosecutor went on to say Compton is "a criminal," not a "government agent," who was "used to get into his source." Celio objected to the use of the word "source," arguing it implied Celio was a drug dealer from whom Compton was getting drugs illegally. He argued that nothing in the evidence showed Celio himself had improperly provided Compton with drugs. The court overruled the objection, maintaining the evidence supported the inference that Compton received prescriptions for drugs from Celio. The government continued with its rebuttal, explaining the evidence had shown that, although Compton forged prescriptions, there was also testimonial evidence that Celio continued to see Compton at the clinic after hours. Although the record does not support the proposition that Compton received *pills* from Celio, it certainly supports the inference that Compton got *prescriptions* from Celio. Because "dispensing" includes providing prescriptions, *see* 21 U.S.C. § 802(10), there was no error in the prosecutor's use of the word "source" or the district court's response to Celio's objection.

In summary, viewed in the context of the trial as a whole, including the district court's curative actions, jury instructions, and the extent and role of

misconduct within the case, the instances challenged by Celio do not rise, either individually or cumulatively, to the level of flagrant prosecutorial misconduct required for a new trial. Although the government's action were, at times, erroneous, the "question for resolution is not the culpability of the government, but the fairness of the trial." *United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997). Based on the record before this court, we conclude Celio received a fair trial and is not entitled to a new one.

## IV. CONCLUSION

For the foregoing reasons, Celio's conviction is **AFFIRMED**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge